## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

SUSAN LESLEY DEEM LOBATO,

     Plaintiff,

     vs.                                           Civ. No. 21-207 JB/KK

KILOLO KIJAKAZI, Acting Commissioner
of the Social Security Administration,[1]

     Defendant.

### PROPOSED FINDINGS AND RECOMMENDED DISPOSITION[2]

THIS MATTER is before the Court on Plaintiff Susan Lesley Deem Lobato's Motion to Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 23), filed October 11, 2021. The Acting Commissioner of the Social Security Administration ("Commissioner") filed a response in opposition to the Motion on January 10, 2022, and Ms. Lobato filed a reply in support of it on February 3, 2022. (Docs. 27, 30.) Having meticulously reviewed the entire record and the relevant law and being otherwise fully advised, the Court proposes to find that Ms. Lobato's Motion is well taken and recommends that it be granted. The Court further recommends that the Commissioner's decision denying Ms. Lobato's claim for benefits be reversed and this matter remanded for further proceedings.

### I.  Factual Background and Procedural History

Ms. Lobato brings this suit pursuant to 42 U.S.C. § 1383(c)(3), seeking reversal of the

---

[1] Kilolo Kijakazi has been automatically substituted for her predecessor, Andrew Saul, as the defendant in this suit. Fed. R. Civ. P. 25(d).

[2] By an Order of Reference (Doc. 6) entered on March 10, 2021, United States District Judge James O. Browning referred this case to me to conduct hearings, if warranted, including evidentiary hearings, and to perform any legal analysis required to recommend to the Court an ultimate disposition of the case.

Commissioner's decision denying her claim for Title XVI supplemental security income ("SSI").[3] (Doc. 1; Doc. 23 at 3.)

### A. Factual Background[4]

Ms. Lobato was born in December 1967, earned a GED certification in 1984 or 1986, and last worked in 2010 for one month as a fast-food restaurant cashier.[5] (AR 36, 57, 60, 191.[6]) At her October 2019 hearing, Ms. Lobato testified that she lives with her brother and tries to drive as little as possible due to anxiety attacks. (AR 42.) She reported that her boyfriend Victor Adams, who was also present at the hearing, drives her to health care appointments "most of the time." (AR 43-45.) According to Ms. Lobato, her "most serious issue" is memory loss, which aggravates her anxiety. (AR 38-39.) She also testified to post-traumatic stress disorder ("PTSD"), anxiety, and depression that "seem[] . . . never-ending," with nightmares, poor sleep, anxiety attacks "almost every day," and "two bad depressions" per month. (AR 41, 48-49.)

On an adult function report completed in February 2018, Ms. Lobato indicated that she did household chores, prepared meals, watered plants, swept the porch, and raked the yard. (AR 213-15.) She reported no problems with personal care and indicated that she could drive, shop, and handle money. (AR 214, 216.) She noted that she meditated, watched television, listened to music, walked, read, went to church, and visited her mother in a nursing home. (AR 213, 217.) However,

---

[3] Section 1383(c)(3) governs SSI claims and provides that "[t]he final determination of the Commissioner . . . shall be subject to judicial review as provided in [42 U.S.C. § 405(g),]" which governs appeals from denials of disability insurance benefits under Title II of the Social Security Act. 42 U.S.C. §§ 405(g), 1383(c)(3).

[4] Because Ms. Lobato does not claim that the ALJ erred in his treatment of her physical impairments, the Court will only discuss Ms. Lobato's psychological and neurological impairments, although it has meticulously reviewed the entire record. (*See generally* Docs. 23, 30.)

[5] More remotely, Ms. Lobato held various jobs for a few months at a time in textiles shipping and receiving, insurance customer service, retail customer service, and restaurant service. (AR 191.)

[6] Citations to "AR" refer to the Certified Transcript of the Administrative Record filed on July 12, 2021. (Doc. 16.)

she also reported that loud places, loud voices, crowds, and "too much stress" caused her to have "anxiety attack[s]," and changes in routine caused her "major anxiety and major depression." (AR 218-19.) On a February 2018 work history report, she indicated that her jobs never lasted more than a year because she "just couldn't cope with the anxiety attacks and depression." (AR 237.)

In a second adult function report completed in August 2018, Ms. Lobato reported similar activities and problems, but added that loud noises and yelling cause flashbacks; when depressed she will sometimes sleep all day; and, when she feels unwell, she does not eat, do chores, or go to church and cannot follow instructions well. (AR 248-55.)

In September 2019, Mr. Adams submitted a sworn statement indicating that he takes Ms. Lobato to her appointments, reminds her to take her medications, and "constantly check[s] up on her to make sure that she is okay," because she "forgets things easily," has "frequent panic attacks" and "severe depression," and "needs someone constantly taking care of her, or else she's unable to function." (AR 283.) And, in a "Neuropsychology Questionnaire" completed with Mr. Adams' help in January 2020, Ms. Lobato reported that she can no longer independently bathe, dress, prepare food, do yard work, manage money, be home alone, drive, or grocery shop. (AR 731-34.) She endorsed a number of cognitive problems and psychological symptoms and indicated that her cognitive problems have worsened since she first became aware of them. (AR 731-34.)

Ms. Lobato received frequent treatment for psychological and neurological disorders in and around the relevant time frame.

1. *Susan Heumiller, L.P.C.C., and Michael Miller, C.N.P., Presbyterian Medical Services*

Susan Heumiller, L.P.C.C., conducted an initial behavioral health assessment of Ms. Lobato on April 14, 2014. (AR 310-15.) Noting multiple abnormal findings, she assigned Ms.

Lobato a GAF score of 45[7] and diagnosed Ms. Lobato with major depressive disorder, recurrent episode, severe; alcohol and cannabis dependence; and, anxiety disorder. (AR 314.) She referred Ms. Lobato to Michael Miller, C.N.P., for psychiatric evaluation and medication management, and also to individual and group therapy. (AR 315.)

The record reflects that Ms. Lobato visited CNP Miller for psychiatric medication management on about 25 occasions between May 2014 and June 2018. (AR 324-39, 349-60, 365-426, 487-91, 500-08.) CNP Miller initially prescribed Zoloft,[8] trazodone,[9] and naltrexone[10] for Ms. Lobato's psychiatric conditions. (AR 326.) He subsequently modified her medication regimen many times, prescribing, *inter alia*, quetiapine[11] (AR 334), Lamictal[12] (AR 339), Antabuse[13] (AR

---

[7] "The GAF is a 100–point scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012). A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

[8] Zoloft, or sertraline, is used to treat depression, obsessive-compulsive disorder, panic attacks, PTSD, and social anxiety disorder. https://medlineplus.gov/druginfo/meds/a697048.html (last visited Feb. 16, 2022).

[9] Trazodone is used to treat depression. https://medlineplus.gov/druginfo/meds/a681038.html (last visited Feb. 16, 2022).

[10] Naltrexone is used to decrease cravings for alcohol and opiates. https://medlineplus.gov/druginfo/meds/a685041.html (last visited Feb. 16, 2022).

[11] Seroquel, or quetiapine, is used to treat schizophrenia, bipolar disorder, and depression. https://medlineplus.gov/druginfo/meds/a698019.html (last visited Feb. 16, 2022).

[12] Lamictal, or lamotrigine, is used to treat seizures and bipolar disorder. https://medlineplus.gov/druginfo/meds/a695007.html (last visited Feb. 16, 2022).

[13] Antabuse, or disulfiram, is used to treat alcoholism. https://medlineplus.gov/druginfo/meds/a682602.html (last visited Feb. 16, 2022).

351), Valium[14] (AR 351), hydroxyzine[15] (AR 360), Celexa[16] (AR 360), Effexor[17] (AR 375), Cymbalta[18] (AR 384), prazosin[19] (AR 415), and BuSpar[20] (AR 507) in various combinations. By June 25, 2018, Ms. Lobato was taking trazodone, naltrexone, quetiapine, hydroxyzine, Cymbalta, prazosin, and BuSpar for her psychiatric conditions, (AR 488), and CNP Miller had diagnosed her with severe episode of recurrent major depressive disorder, without psychotic features, and chronic PTSD. (AR 489-90.)

In July 2015, CNP Miller documented that Ms. Lobato had been "in and out of jail and rehab in [the] last 6 months." (AR 366.) Similarly, in May 2016, he noted that she was "just out of jail after 5 months." (AR 370.) In October 2016, he reported that she was "still struggling with depression," her "anxiety [was] under control as long as anxiety producing situations are avoided," and she was "sober 10 months." (AR 379.) In December 2016, he recorded that she had "graduated from drug court," her mood was "stable," and she was sober. (AR 392.) By November 2017, CNP Miller reported that Ms. Lobato's mood was "euthymic and stable" and her "anxiety [was] under

---

[14] Valium, or diazepam, is used to treat anxiety, alcohol withdrawal, and seizures. https://medlineplus.gov/druginfo/meds/a682047.html (last visited Feb. 16, 2022).

[15] Hydroxyzine is used psychiatrically to treat anxiety. https://medlineplus.gov/druginfo/meds/a682866.html (last visited Feb. 16, 2022).

[16] Celexa, or citalopram, is used to treat depression. https://medlineplus.gov/druginfo/meds/a699001.html (last visited Feb. 16, 2022).

[17] Effexor, or venlafaxine, is used to treat depression, generalized anxiety disorder, social anxiety disorder, and panic disorder. https://medlineplus.gov/druginfo/meds/a694020.html (last visited Feb. 16, 2022).

[18] Cymbalta, or duloxetine, is used psychiatrically to treat depression and generalized anxiety disorder. https://medlineplus.gov/druginfo/meds/a604030.html (last visited Feb. 16, 2022).

[19] Prazosin is used psychiatrically to treat PTSD. https://medlineplus.gov/druginfo/meds/a682245.html (last visited Feb. 16, 2022).

[20] BuSpar, or buspirone, is used to treat anxiety disorders. https://medlineplus.gov/druginfo/meds/a688005.html (last visited Feb. 16, 2022).

control." (AR 420.) However, on January 4, 2018, he documented her "anxious" mood and noted that she

> tried to work part time – could not tolerate the stress. Wanting to apply for disability. [Ms. Lobato's] residual function is markedly limited in the areas of understanding and memory, sustained concentration and persistence, social interaction, and adaptation. [I] will support her getting disability.

(AR 424-25.)

LPCC Heumiller performed another behavioral health assessment of Ms. Lobato on June 5, 2018. (AR 492-99.) She noted various abnormal findings on screening tests, including a GAD-7 score indicating "severe anxiety" and a PHQ-9 score indicating "[m]oderate depression." (AR 494, 497.) On mental status examination, she assessed depressed, anxious mood, constricted affect, depressive, "self-deprecatory" preoccupations and ruminations, cognitive impairment, partial insight, and mildly impaired ability to make reasonable decisions. (AR 496.) She also noted that Ms. Lobato "would forget what she was saying" and "what question was asked of her." (AR 496-97.) LPCC Heumiller diagnosed Ms. Lobato with PTSD, symptomatic, serious mental illness[21]; recurrent major depressive disorder in partial remission, improved, serious mental illness; and, alcohol use disorder, severe, in sustained remission, inactive, co-occurring disorder. (AR 498.) She indicated Ms. Lobato should continue to see CNP Miller for psychiatric medication management, and again referred her to individual and group therapy. (AR 498.)

At her last documented visit with CNP Miller on June 25, 2018, CNP Miller noted that Ms. Lobato's symptoms were "well controlled," she "report[ed] functioning as somewhat difficult,"

---

[21] A "serious mental illness" is "a mental, behavioral, or emotional disorder resulting in serious functional impairment, which substantially interferes with or limits one or more major life activities." Nat'l Inst. Mental Health, U.S. Dep't of Health & Hum. Servs., "Mental Illness," at https://www.nimh.nih.gov/health/statistics/mental-illness (last visited Feb. 16, 2022).

(AR 487), her mood was euthymic, she was sober, and her anxiety was "under control[]if she uses 100mg of Seroquel BID." (AR 489-90.)

    2.    *Elizabeth Buck, L.P.C.C., Journey Guidance Services*

Ms. Lobato first saw Elizabeth Buck, L.P.C.C., for individual therapy on October 26, 2018. (AR 544-45, 620.) On a mental status exam that day, LPCC Buck noted Ms. Lobato's "stiff" behavior, "halting" speech, tearful, blunted affect, anxious, depressed mood, disorganized thought process, passive suicidal ideation, distractable/inattentive memory, and fair insight. (AR 545.) She further noted Ms. Lobato's "memory lapses," "lost train of thought," "long term alcohol abuse, grief, loss," and "extreme anxiety." (AR 545.) In treatment notes made the same date, LPCC Buck characterized Ms. Lobato as "nervous but engaged as evidenced by her restlessness, wide eyes and statements about anxiety." (AR 620.)

The record reflects that, after this first visit, Ms. Lobato saw LPCC Buck for individual cognitive behavioral therapy on another 27 occasions between November 2018 and August 2019. (AR 622-43, 649-50, 658, 662, 665.) LPCC Buck sometimes documented observing Ms. Lobato's memory lapses at these visits, noting that they appeared to "bewilder[]" and "disturb[]" Ms. Lobato. (AR 622, 627, 629, 636, 637, 642.) She also reported her observations of Ms. Lobato's mood, which ranged from "open," "engaged," and/or "grounded" to "anxious," "depressed," and/or "distressed." (AR 622-43, 649-50, 658, 662, 665.) At her last documented visit with LPCC Buck on August 16, 2019, LPCC Buck wrote that Ms. Lobato "appeared distressed as evidenced by her low energy, sad expression, ruminative thoughts and self-report. [Ms. Lobato] seems to be anxious and depressed." (AR 665.)

    3.    *Carrie Elizabeth Jones, M.D., and Kamasamudram Ravilochan, M.D., Presbyterian Medical Group*

On November 28, 2017, Ms. Lobato reported anxiety to primary care physician Carrie Elizabeth Jones, M.D., and indicated she would like to resume taking BuSpar. (AR 299-300.) Dr. Jones noted Ms. Lobato was "nervous/anxious" and advised her to follow up with CNP Miller. (AR 302.)

On June 7, 2018, Ms. Lobato presented to Dr. Jones complaining of "frequent memory loss, stu[tt]ering speech, increased vision problems, shak[i]ness in body notic[e]able in speech, unable to speak out at times." (AR 466.) On exam, Dr. Jones noted that Ms. Lobato displayed intention tremor in her bilateral hands.[22] (AR 469.) Dr. Jones reported that Ms. Lobato was

> able to recall everything clearly today, however her husband[23] reports her having intermittent times where she is "stupid." He says he does not mean this in a mean way, however she just seems to have a hard time understanding what he [is saying] or he has to repeat himself multiple times.

(AR 469.) She also noted that Ms. Lobato had "a slight slur to her speech chronically," though "[h]er husband notes only a more recent change where her voice sounds shaky and she has trouble finding the right words." (AR 470.) Dr. Jones assessed Ms. Lobato with primary memory impairment, confusion, tremor, and speech problem, and ordered a brain MRI and lab tests. (AR 469-70.)

At a follow-up appointment with Dr. Jones on November 19, 2018, Ms. Lobato reported continued short-term memory issues and intermittent tremor, and stated that insurance refused to cover the brain MRI. (AR 572.) She also complained of shortness of breath during "anxiety

---

[22] An intention tremor "is produced with purposeful movement toward a target, such as lifting a finger to touch the nose." Nat'l Inst. of Neurological Disorders & Stroke, "Tremor Fact Sheet," https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Tremor-Fact-Sheet (last visited Feb. 16, 2022).

[23] At her hearing, Ms. Lobato explained that Mr. Adams is the "husband" referred to in this record. (AR 43-44.) Other medical records also refer to Ms. Lobato's "husband," and this person also appears to be Mr. Adams in light of Ms. Lobato's testimony that her ex-husband died in 2009 and Mr. Adams usually accompanies her to appointments. (AR 43-45.)

attacks." (AR 575.) Dr. Jones noted that Ms. Lobato was "nervous/anxious" but that her tremor was not present that day. (AR 575.) She referred Ms. Lobato to neurology for memory loss and tremor. (AR 575-76.)

Ms. Lobato saw neurologist Kamasamudram Ravilochan, M.D., on December 21, 2018 for memory loss and tremor. (AR 579.) She reported that both problems were "getting worse." (AR 579.) On exam, Dr. Ravilochan noted that Ms. Lobato had an "abnormal Finger-Nose-Finger Test (Past pointing[]), an abnormal Heel to Shin Test and an abnormal Tandem Gait Test." (AR 583-84.)  He also noted her Montreal Cognitive Assessment Test score of 16/30 and her intention tremor. (AR 583.) Dr. Ravilochan assessed that Ms. Lobato's symptoms were worse because of anxiety but that anxiety alone did not explain all of them. (AR 584.) He diagnosed memory impairment and tremor and ordered a brain MRI "as a first step to rule out a space-occupying lesion in the brain," after which he would "consider an EEG." (AR 584.)

Ms. Lobato returned to Dr. Ravilochan on February 11, 2019, at which time she was still waiting for insurance approval of her MRI. (AR 592.) She reported that her memory was declining but her tremors were slightly better. (AR 592.) On exam, Dr. Ravilochan noted "[s]light difficulty with tandem walking" and "[p]ast pointing on finger-nose-finger testing," though "less pronounced than at prior exam." (AR 594.) He prescribed Aricept[24] while waiting for MRI results. (AR 594.) When Ms. Lobato saw Dr. Ravilochan again on March 11, 2019, both she "and her husband note[d] that there [was] a significant improvement in her memory after she [started taking] Aricept." (AR 596.) At this visit, Dr. Ravilochan reported that Ms. Lobato's brain MRI results showed "some frontal and temporal atrophy" that "may be slightly out of proportion to [her] age." (AR 599.) He assessed that Ms. Lobato "does have memory problems" but that they are "more

---

[24] Aricept, or donepezil, is used to treat dementia. https://medlineplus.gov/druginfo/meds/a697032.html (last visited Feb. 16, 2022).

likely" due to "minimal cognitive impairment" than "a true dementia." (AR 600.) He continued to prescribe Aricept "as she seems to have benefited from this." (AR 600.)

At an appointment with Dr. Jones on August 22, 2019, Ms. Lobato requested a neuropsychological evaluation, which Dr. Jones thought was "a good idea, to get some assessment of her functional limitations, as well as to help her be independent in [as] many tasks as possible." (AR 723.) On exam, Dr. Jones noted that Ms. Lobato did "eventually recall all necessary information, but perhaps t[ook] a little while with word finding at times during the visit. Visibly anxious." (AR 723.) Also, at an appointment with Dr. Ravilochan on September 11, 2019, Ms. Lobato thought her memory was better "to a certain extent," but her "husband [did] not think she [was] any better" and was "concerned that not eating [was] affecting her cognition." (AR 725.) Dr. Ravilochan increased Ms. Lobato's dose of Aricept but "told the patient's husband not to expect major changes in her condition." (AR 727.)

> 4.    *Christus St. Vincent Hospital and Sharon Cooperman, M.D.*

Ms. Lobato presented to the emergency department ("ED") at Christus St. Vincent Hospital on November 8, 2019 for a seizure with loss of consciousness, reporting that it was her third seizure in about seven months. (AR 738-39, 741.) She was started on Depakote[25] and referred to neurology. (AR 744.) She returned to the ED on November 23, 2019, "having full body clonus," "twitching in triage, unable to ambulate." (AR 791.) Per the ED notes, after starting Depakote, Ms. Lobato developed increased tremors and an unsteady gait, had multiple falls, and began using a walker. (AR 792, 808.) The ED notes further indicate that Ms. Lobato had seen a neurologist

---

[25] Depakote, also known as divalproex or valproic acid, is used to treat seizures and bipolar disorder. https://medlineplus.gov/druginfo/meds/a682412.html (last visited Feb. 16, 2022).

named Dr. Walskey three days earlier, and he took her off of Aricept and Namenda[26] because he "did not feel she had dementia, but more probably Wernicke's encephalopathy[.]" (AR 792.) On exam, she exhibited dystonic movements, could not sit still, and had difficulty focusing on questions, though she answered appropriately "when directed." (AR 793.) When consulted, her neurologist said she had an upcoming EEG; he had "noted her cerebellar symptoms in the office"; and, he recommended discontinuing Depakote and starting Keppra.[27] (AR 793-94.)

On January 21, 2020, Ms. Lobato saw neurologist Sharon Cooperman, M.D. (AR 876.) She reported Ms. Lobato's March 4, 2019 MRI "was significant for diffuse, generalized cerebral atrophy," "slightly advanced for age, and minimal chronic small vessel ischemic change," and her June 3, 2019 head CT scan "was significant for prominent ventricles and sulci consistent with atrophy and low attenuation in the white matter consistent with small vessel ischemic disease." (AR 876-77.) On exam, Dr. Cooperman noted unequal pupils, abnormal Finger-Nose-Finger Test and Heel to Shin Test results, blunt affect, decreased attention and concentration, and intention tremor, and observed that Ms. Lobato "follow[ed] commands slowly and sometimes [did] not follow commands." (AR 881-82.) She diagnosed Ms. Lobato with seizure disorder, mild cognitive impairment, frequent falls, and excessive daytime sleepiness, ordered an EEG, and referred Ms. Lobato to physical and occupational therapy and sleep medicine. (AR 883.)

5.  *Medical source opinions*

  a.  **Michael Miller, C.N.P.**

On November 27, 2018, CNP Miller completed a "Medical Assessment of Ability to Do

---

[26] Namenda, or memantine, is used to treat the symptoms of Alzheimer's disease. https://medlineplus.gov/druginfo/meds/a604006.html (last visited Feb. 16, 2022).

[27] Keppra, or levetiracetam, is used to treat seizures. https://medlineplus.gov/druginfo/meds/a699059.html (last visited Feb. 16, 2022).

Work-Related Activities (Mental)" regarding Ms. Lobato. (AR 531-32.) The form instructed him to "consider the patient's medical history and the chronicity of findings as from 2017 to current examination." (AR 531.) On this date, CNP Miller opined that Ms. Lobato was markedly limited in her abilities to: (1) maintain attention and concentration for two-hour segments; and, (2) complete a normal workday and workweek without interruptions from psychological symptoms and perform at a consistent pace without unreasonable rest periods. (AR 531.) He also opined that she was moderately limited in her abilities to: (1) remember locations and work-like procedures; (2) understand and remember detailed instructions; (3) carry out detailed instructions; (4) perform activities on a schedule, maintain regular attendance, and be punctual; (5) sustain an ordinary routine without special supervision; (6) work with or near others without being distracted by them; (7) interact appropriately with the public; (8) accept instructions and respond appropriately to criticism from supervisors; (9) get along with coworkers without distracting them or exhibiting behavioral extremes; (10) respond appropriately to changes in the workplace; (11) be aware of normal hazards and take adequate precautions; and, (12) set realistic goals or make plans independently. (AR 531-32.) Asked to "[p]lease describe any additional significant mental limitations," CNP Miller wrote, "memory deficits secondary to anxiety & inability to make decision[s] when under minor/moderate stress." (AR 532.)

Also on November 27, 2018, CNP Miller completed three forms entitled "Depressive, Bipolar and Related Disorders (12.04)," "Anxiety and Obsessive-Compulsive Disorders (12.06)," and "Trauma and Stressor-Related Disorders (12.15)," respectively. (AR 533-36.) On the first form, he opined that Ms. Lobato had a depressive order characterized by depressed mood, diminished interest in almost all activities, sleep disturbance, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking, resulting in marked limitations in

understanding, remembering, or applying information and concentrating, persisting, or maintaining pace. (AR 533.) On the second form, he opined that Ms. Lobato had an anxiety disorder characterized by difficulty concentrating, irritability, muscle tension, and sleep disturbance, resulting in the same marked limitations as those indicated on the first form. (AR 534.) And on the third form, he opined that Ms. Lobato's trauma disorder resulted in the same marked limitations as those indicated on the first form, also noting evidence of "[m]arginal adjustment, that is, minimal capacity to adapt to changes in environment or demands that are not already part of one's daily life." (AR 535-36.)

On July 31, 2019, CNP Miller completed another "Medical Assessment of Ability to Do Work-Related Activities (Mental)" regarding Ms. Lobato. (AR 541-42.) As before, the form asked him to "consider the patient's medical history and the chronicity of findings as from 12/29/2017 to current examination." (AR 541.) On this form, CNP Miller opined that Ms. Lobato is markedly limited in her abilities to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for two-hour segments; (4) perform activities on a schedule, maintain regular attendance, and be punctual; (5) sustain an ordinary routine without special supervision; (6) work with or near others without being distracted by them; (7) complete a normal workday and workweek without interruptions from psychological symptoms and perform at a consistent pace without unreasonable rest periods; (8) respond appropriately to changes in the workplace; and, (9) set realistic goals or make plans independently. (AR 541-42.)

CNP Miller also opined on this form that Ms. Lobato is moderately limited in her abilities to: (1) remember locations and work-like procedures; (2) understand and remember very short and simple instructions; (3) carry out very short and simple instructions; (4) make simple work-related decisions; (5) interact appropriately with the public; (6) ask simple questions or request

assistance; (7) accept instructions and respond appropriately to criticism from supervisors; (8) get along with coworkers without distracting them or exhibiting behavioral extremes; (9) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; (10) be aware of normal hazards and take adequate precautions; and, (11) travel in unfamiliar places or use public transportation. (AR 541-42.)

Also on July 31, 2019, CNP Miller completed another "Anxiety and Obsessive-Compulsive Disorders (12.06)" questionnaire. (AR 540.) On this form, he opined that Ms. Lobato has an anxiety disorder characterized by easy fatigue, difficulty concentrating, irritability, muscle tension, and sleep disturbance, and a panic disorder or agoraphobia characterized by disproportionate fear or anxiety about at least two different situations. (AR 540.) He further opined that these disorders have resulted in extreme limitations in her abilities to understand, remember, or apply information and concentrate, persist, or maintain pace, and marked limitations in her abilities to interact with others and adapt or manage herself. (AR 540.)

### b.      Elizabeth Buck, M.A., L.P.C.C.

On July 25, 2019, LPCC Buck completed two forms regarding Ms. Lobato. (AR 538-39.) Both forms requested "an assessment of how the patient's mental/emotional capabilities are affected by the impairment(s)," and directed LPCC Buck to "consider the patient's medical history and the chronicity of findings as from 12/29/2017 to current examination." (AR 538-39.) On the first form, entitled "Anxiety and Obsessive-Compulsive Disorders (12.06)," she opined that Ms. Lobato has an anxiety disorder characterized by restlessness, easy fatigue, difficulty concentrating, irritability, muscle tension, and sleep disturbance, and a panic disorder or agoraphobia characterized by panic attacks, persistent concern or worry about additional panic attacks or their consequences, and disproportionate fear or anxiety about at least two different situations. (AR

538.) She further opined that these impairments have resulted in marked limitations in Ms. Lobato's abilities to remember information, concentrate, persist, or maintain pace, and adapt or manage herself. (AR 538.)

On the second form, entitled "Depressive, Bipolar and Related Disorders (12.04)," LPCC Buck opined that Ms. Lobato has a depressive disorder characterized by depressed mood, diminished interest in almost all activities, appetite disturbance with weight change, sleep disturbance, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking. (AR 539.) According to LPCC Buck, this disorder has resulted in marked limitations in Ms. Lobato's abilities to remember information, concentrate, persist, or maintain pace, and adapt or manage herself. (AR 539.) She also opined that Ms. Lobato's depressive disorder has resulted in a minimal capacity to adapt to changes in her environment or demands that are not already part of her daily life. (AR 539.)

In addition, on August 8, 2019, LPCC Buck sent a letter to Ms. Lobato's attorney addressed "To Whom It May Concern," in which she indicated that Ms. Lobato "comes to weekly one-hour counseling sessions" at which she shows "a strong desire" to master calming and coping techniques, but that "a number of accidents and financial situations … keep her in a state of anxiety." (AR 544.) According to LPCC Buck, Ms. Lobato "experiences frequent panic attacks," and "demonstrates the symptoms of PTSD including flashbacks, nightmares, recurrent distressing memories, dissociation, and avoidance of places and people that arouse distressing memories." (AR 544.) LPCC Buck added that "Ms. Lobato has an exaggerated startle response and difficulty concentrating," and she had "witnessed [Ms. Lobato] shaking and dissociated a number of times in session." (AR 544.) She also noted Ms. Lobato's "alarming lapse in memory," and stated that over the ten months she had worked with Ms. Lobato, Ms. Lobato had "increasingly lost her train

of thought in session" and "expresse[d] distress about her inability to recapture her thoughts." (AR 544.) LPCC Buck concluded that, "[g]iven the number and severity of [Ms. Lobato's] symptoms, I believe that she is incapable of maintaining employment." (AR 544.)

### c.    Bianca McDermott, Ph.D.

On referral from Dr. Jones, Bianca McDermott, Ph.D., performed a neuropsychological evaluation of Ms. Lobato on January 30, 2020. (AR 862.) She noted that Ms. Lobato "was not a good historian" and that Mr. Adams "provided some of the historical information as well as behavioral observations." (AR 862.) She also noted that Ms. Lobato was "very anxious and would like to know more about what is causing her seizures and cognitive decline. Despite being on multiple psychiatric medications and seeing a therapist weekly, she reports severe anxiety and depression." (AR 863.)

Dr. McDermott administered a number of psychometric tests, which "indicated moderate to severe impairments in every cognitive domain assessed." (AR 865-66.) However, she opined that the level of impairment the tests indicated was inconsistent with Ms. Lobato's abilities to "interact and engage in conversation" and "function in the community." (AR 866.) Dr. McDermott also noted that six tests "had to be discontinued" because Ms. Lobato "did not appear to be putting forth effort during tests and she would stop participating at random times." (AR 866.) She concluded that Ms. Lobato "is currently reporting severe anxiety and depression" and that Ms. Lobato's "mental status precludes valid neuropsychological testing at this time." (AR 866.) She diagnosed Ms. Lobato with PTSD, major depressive disorder, moderate, single episode, and anxiety, and opined that Ms. Lobato "does not appear clinically stable[.]" (AR 866.)

### B.  Procedural History

Ms. Lobato applied for SSI on December 29, 2017, alleging disability beginning on

September 1, 2014, due to PTSD, anxiety attacks, headaches, dizziness, stomach issues, nightmares and flashbacks, and loss of breath. (AR 57-58, 190.) Her claim was denied initially and on reconsideration. (AR 66, 78.) Administrative Law Judge ("ALJ") Cole Gerstner held a hearing on October 15, 2019, at which Ms. Lobato and an impartial vocational expert ("VE") testified. (AR 33-56.)

The ALJ issued an unfavorable ruling on March 27, 2020, using the Commissioner's five-step sequential evaluation process.[28] (AR 10-26.) At step one, the ALJ found that Ms. Lobato has not engaged in substantial gainful activity since her application date.[29] (AR 16.) At step two, he found that Ms. Lobato suffers from the severe impairments of depression, anxiety, and seizure disorder.[30] (AR 16.) However, the ALJ determined at step three that these impairments do not meet or medically equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 17-20.)

The ALJ determined that Ms. Lobato has the residual functional capacity ("RFC") to perform a full range of work at all exertional levels with the following non-exertional limitations:

> the claimant can never climb ladders, ropes, or scaffolds; can never work at unprotected heights; can never work with moving mechanical parts; and can never operate a motor vehicle. The claimant is able to perform simple routine tasks; judgment is limited to simple work-related decisions; is able to have superficial

---

[28] *See Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); 20 C.F.R. § 416.920.

[29] Because Ms. Lobato applied for SSI benefits only, the period under consideration runs from her application date rather than her alleged onset date. *Wall v. Astrue*, 561 F.3d 1048, 1068 n.28 (10th Cir. 2009); 20 C.F.R. § 416.335.

[30] The ALJ acknowledged that, "[t]hroughout the record, there are several mental diagnoses for the claimant." (AR 21.) However, he added that,

> [a]fter reviewing these diagnoses and their corresponding symptoms, the undersigned feels that the above stated impairments are most consistent with the record. Accordingly, the claimant's psychological symptoms and their effect on her functioning have been considered together, instead of separately, regardless of the diagnostic label attached.

(AR 21.) He also noted that "[a]lthough Ms. Lobato has a history of alcohol dependence, the record consistently demonstrates that she has been in sustained remission during the entire relevant period." (AR 16.)

contacts with supervisors, coworkers, and the public; and changes in the work setting are limited to simple work.

(AR 20.) In assessing Ms. Lobato's RFC, the ALJ considered opinion evidence from medical sources LPCC Buck, CNP Miller, and Dr. McDermott, and prior administrative findings from non-examining state agency consultants Kathleen Padilla, Ph.D., Edith King, Ph.D., and Nabeel Uwaydah, M.D. (AR 23-24.) At step four, the ALJ found that Ms. Lobato has no past relevant work. (AR 25.)

At step five, the ALJ found that an individual of Ms. Lobato's age and with her education, work experience, and assessed RFC could perform jobs existing in significant numbers in the national economy. (AR 25-26.) Specifically, based on VE testimony and his review of the Dictionary of Occupational Titles, the ALJ determined that Ms. Lobato could work as a marker, housekeeping cleaner, or router. (AR 25-26.) The ALJ therefore concluded that Ms. Lobato is not disabled. (AR 26.)

The Appeals Council denied review on January 15, 2021, and the ALJ's decision became administratively final. (AR 1–3.) Ms. Lobato now seeks reversal and remand of the ALJ's decision finding that she is not disabled. (Doc. 23 at 1.)

## II. <u>Standard of Review</u>

The Court's review of the Commissioner's final decision is limited to determining whether substantial evidence supports the ALJ's factual findings and whether the ALJ applied the correct legal standards to evaluate the evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). In making these determinations, the Court must meticulously examine the entire record but may neither reweigh the evidence nor substitute its judgment for that of the agency. *Flaherty v. Astrue*, 515 F.3d 1067, 1070-71 (10th Cir. 2007). In other words, the Court does not reexamine the issues *de novo*. *Sisco v. U.S. Dep't of Health &*

*Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993). The Court will not disturb the agency's final decision if it correctly applies legal standards and is based on substantial evidence in the record.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). It is "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). The Court's examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).

"The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (quotation marks and brackets omitted). Thus, although an ALJ is not required to discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence," and "in addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). If the ALJ fails to do so, "the case must be remanded for the ALJ to set out his specific findings and his reasons for accepting or rejecting evidence[.]" *Id.* at 1010.

### III.  <u>Analysis</u>

Ms. Lobato contends that the ALJ did not apply correct legal standards and that his decision

was not supported by substantial evidence.[31] (Doc. 23.) More particularly, she argues that the ALJ erred both legally and factually in rejecting the opinions of LPCC Buck and CNP Miller. (*Id.*) For the following reasons, the Court proposes to find that Ms. Lobato's arguments are well taken and recommends that her request for remand be granted.

### A.     The ALJ did not adequately support his rejection of LPCC Buck's and CNP Miller's opinions.

Ms. Lobato asserts that the ALJ failed to properly consider the opinions of her cognitive behavioral therapist, LPCC Buck, and her psychiatric nurse practitioner, CNP Miller. (*Id.* at 11-22.) An ALJ may account for moderate functional limitations that a medical source[32] assesses "by limiting the claimant to particular kinds of work activity" in his RFC determination. *Smith v. Colvin*, 821 F.3d 1264, 1269 (10th Cir. 2016). However, when the ALJ assigns an RFC that contradicts a medical source opinion, the ALJ must explain why he did not account for the opinion in the RFC. *Givens v. Astrue*, 251 F. App'x 561, 568 (10th Cir. 2007) (unpublished) ("If the ALJ rejects any significantly probative medical evidence concerning [the claimant's] RFC, he must provide adequate reasons for his decision to reject that evidence."). Where the ALJ does not adequately support his rejection of a medical source opinion concerning the claimant's RFC, the case must be remanded for the ALJ to do so. *Haga v. Astrue*, 482 F.3d 1205, 1207-09 (10th Cir. 2007).

As both parties acknowledge, (Doc. 23 at 11-12; Doc. 27 at 20), the Commissioner has issued new regulations regarding the evaluation of medical source opinions for claims filed on or

---

[31] In her Motion, Ms. Lobato also argued that the ALJ's authority over the case, which stems from the Commissioner's authority, is unconstitutional under *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183 (2020). (Doc. 23 at 22-23.) However, she "respectfully concedes" this argument in her reply. (Doc. 30 at 1.)

[32] LPCC Buck and CNP Miller are both "medical source[s]." 20 C.F.R. § 416.902(a), (*i*).

after March 27, 2017. *See* "Revisions to Rules Regarding the Evaluation of Medical Evidence," 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017); *compare* 20 C.F.R. § 416.927 ("Evaluating opinion evidence for claims filed before March 27, 2017") *with* 20 C.F.R. § 416.920c ("How we consider and articulate medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017"). Because Ms. Lobato filed her claims in December 2017, the new regulations apply to this matter. (AR 57-58, 66, 78.)

The new regulations provide that the agency "will articulate in our determination or decision how persuasive we find all of the medical opinions . . . in your case record." 20 C.F.R. § 416.920c(b). Addressing the agency's new "articulation requirements," the regulations state that,

> when a medical source provides multiple medical opinion(s) [sic] . . . we will articulate how we considered the medical opinions . . . from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion . . . from one medical source individually.

20 C.F.R. § 416.920c(b)(1). The regulations further provide that

> [t]he factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions . . . to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions . . . in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions . . . in your case record.

20 C.F.R. § 416.920c(b)(2). "[T]he factors in paragraphs (c)(3) through (c)(5)" are the source's "[r]elationship with the claimant," the source's "[s]pecialization," and "other factors that tend to support or contradict a medical opinion." 20 C.F.R. § 416.920c(c)(3)-(c)(5). If the ALJ finds that two or more differing opinions are equally well-supported and consistent, he must "articulate how [he] considered the . . . factors in paragraphs (c)(3) through (c)(5)." 20 C.F.R. § 416.920c(b)(3).

As the Tenth Circuit has explained,

> "[s]upportability" examines how closely connected a medical opinion is to the evidence and the medical source's explanations: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s), the more persuasive the medical opinions will be." [20 C.F.R.] § 404.1520c(c)(1); *id.* § 416.920c(c)(1). "Consistency," on the other hand, compares a medical opinion to the evidence: "The more consistent a medical opinion(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) will be." *Id.* § 404.1520c(c)(2); *id.* § 416.920c(c)(2).

*Zhu v. Comm'r, SSA*, — F. App'x —, 2021 WL 2794533, at *6 (10th Cir. Jul. 6, 2021) (brackets and ellipses omitted).

The agency's new regulations do not, in the Court's view, alter the Tenth Circuit's requirement that an ALJ must explain his rejection of any medical source opinions in the record concerning the claimant's RFC. *Frantz v. Astrue*, 509 F.3d 1299, 1302-03 (10th Cir. 2007); *Haga*, 482 F.3d at 1208; *Givens*, 251 F. App'x at 568. This requirement flows from the premise that an ALJ's decision must "discuss the uncontroverted evidence [the ALJ] chooses not to rely upon, as well as significantly probative evidence he rejects," *Clifton*, 79 F.3d at 1009-10, in order to provide the Court "with a sufficient basis to determine that appropriate legal principles have been followed[.]" *Jensen*, 436 F.3d at 1165. The requirement enables the courts to engage in meaningful judicial review of agency decisions.

Moreover, "all the ALJ's required findings must be supported by substantial evidence, and he must consider all relevant medical evidence in making those findings." *Grogan*, 399 F.3d at 1262 (citations and quotation marks omitted). Thus, the ALJ's reasons for rejecting medical opinions regarding the claimant's work-related abilities must be supported by substantial evidence, and the ALJ must consider all relevant medical evidence in weighing those opinions. *Id.*; *see generally, e.g., Langley*, 373 F.3d at 1116 (reversing ALJ's decision where, *inter alia*, ALJ's

reasons for rejecting medical opinions were not or did not appear to be supported by substantial evidence).

1.      *The ALJ did not adequately support his rejection of LPCC Buck's opinions.*

The ALJ discussed LPCC Buck's opinions as follows:

> In August 2019, Eliza Buck, LPCC, opined that the claimant experiences a number of symptoms, which results in her being incapable of maintaining employment. This opinion is not persuasive because it opines directly on the ultimate issue of disability, which is reserved to the Commissioner. In questionnaires, Ms. Buck opined that the claimant has marked limitations in understanding, remembering, or applying information, maintaining concentration, persistence, or pace, and adapting or managing oneself, as well as minimal capacity to adapt to changes in her environment or that are not already a part of her daily life. She further opined that the claimant requires ongoing medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) to diminish the symptoms and signs of her mental disorder. These opinions are not persuasive. First, they are checkbox forms entirely without support or further explanation. Second, they are inconsistent with the longitudinal evidence of record, including many instances of far more benign clinical findings than would support such conclusions.

(AR 23-24 (citations omitted).)

Upon careful review of the ALJ's decision and the record as a whole, the Court proposes to find that the ALJ failed to provide adequate reasons for rejecting the opinions LPCC Buck expressed on the forms she completed. The reasons the ALJ gave for rejecting these opinions are legally improper, not supported by substantial evidence, or both. For his supportability analysis, 20 C.F.R. § 416.920c(c)(1), the ALJ asserted that LPCC Buck's opinions "are checkbox forms entirely without support or further explanation." (AR 23.) There are two problems with this analysis. First,

> [i]n the Tenth Circuit, . . . the ALJ cannot reject a treating physician's opinion solely on the basis that it is rendered on a checkbox-style form. Instead, the ALJ must examine whether checkbox-style forms are supported by the doctor's examinations of the patient or other clinical assessments before disregarding them.

*Hidalgo v. Saul*, No. 1:19-CV-00268-LF, 2020 WL 2316190, at *6 (D.N.M. May 11, 2020) (citing

*Carpenter v. Astrue*, 537 F.3d 1264, 1267 (10th Cir. 2008); *Chapo v. Astrue*, 682 F.3d 1285, 1289

(10th Cir. 2012); *Andersen v. Astrue*, 319 F. App'x 712[, 723-24] (10th Cir. 2009) (unpublished)).

Although this rule of law was developed under the old regulation, 20 C.F.R. § 416.927; *see*

*Hidalgo*, 2020 WL 2316190 at *4, and the new regulation, 20 C.F.R. § 416.920c, governs this

case, supportability

> is not a new factor. It is the same supportability factor that ALJs have long
> considered under the treating physician rule. Therefore, caselaw about the
> supportability of medical opinions under the treating physician rule applies to the
> supportability of such opinions under 20 C.F.R. § 404.1520c(c)(1).[33]

*Kosea v. Kijakazi*, No. CV 20-307 WJ/GBW, 2021 WL 3913051, at *8 (D.N.M. Sept. 1, 2021)

(citation omitted); *see also* "Revisions to Rules Regarding the Evaluation of Medical Evidence,"

82 Fed. Reg. 5844-01, at 5,857 (supportability and consistency under new regulations "are the

same factors we look to as part of the current treating source rule"). Thus, in the Tenth Circuit, the

fact that LPCC Buck expressed her opinions on checkbox forms is not, by itself, an adequate reason

to reject those opinions.

The second problem with the ALJ's supportability analysis lies in his assertion that LPCC

Buck's opinions are "entirely without support or further explanation." (AR 23.) The Commissioner

argues that, under the new regulations, an ALJ analyzing the supportability of a medical source's

opinions need only consider the objective evidence and explanations that the source presented for

the particular purpose of supporting the opinions. (Doc. 27 at 23.) In so arguing, the Commissioner

necessarily implies that an ALJ may properly disregard evidence the source generated if it served

some other purpose, such as to document treatment. (*Id.*) And, according to the Commissioner,

---

[33] 20 C.F.R. § 404.1520c(c)(1) and 20 C.F.R. § 416.920c(c)(1) differ only in that the former applies to claims for disability insurance benefits under Title II and the latter applies to claims for SSI under Title XVI.

LPCC Buck did not "present[] any objective evidence or explanation" for the purpose of supporting her opinions. (*Id.*)

The Commissioner is both legally and factually mistaken. Legally, the new regulation does not support the Commissioner's position. As previously noted, the new regulation explains supportability by stating that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more persuasive the medical opinions . . . will be." 20 C.F.R. § 416.920c(c)(1). The Commissioner suggests that the phrase "to support his or her medical opinion(s)" modifies the phrase "presented by a medical source." (Doc. 27 at 23.) In other words, she suggests that the regulation refers to evidence and explanations presented by a source in order to support his or her opinions. (*Id.*) But a more careful reading of the regulation shows that the phrase "to support his or her medical opinion(s)" modifies the phrase "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are." 20 C.F.R. § 416.920c(c)(1) (emphasis added). In other words, it refers to the relevance of the source's evidence and explanations in relation to his or her opinions. Thus, here, the ALJ was to consider how "relevant the objective medical evidence and supporting explanations presented by [LPCC Buck] are to support . . . her medical opinion(s)." *Id.* He was not to ignore the evidence and explanations LPCC Buck generated for purposes such as diagnosis and treatment.

In addition, factually, the Commissioner is mistaken in asserting that LPCC Buck did not present any objective evidence or explanations for the purpose of supporting her opinions. On the contrary, her August 8, 2019 letter does present such evidence and explanations. (AR 544.) In this letter, LPCC Buck described the psychological conditions with which Ms. Lobato presented, the treatment LPCC Buck provided, the symptoms Ms. Lobato reported, and the signs LPCC Buck

witnessed in therapy sessions. (AR 544.) She also attached copies of Ms. Lobato's intake mental status exam and treatment plans. (AR 544.) Both the letter and its attachments unequivocally support the opinions LPCC Buck proffered on the checkbox forms she completed. Moreover, though the letter specifically references LPCC Buck's general opinion that Ms. Lobato is unable to work rather than the more specific opinions she proffered on the forms she completed two weeks earlier, the letter's context, contents, and recipient plainly show that it was offered to support all of her opinions regarding Ms. Lobato's functional limitations.

The Commissioner argues that, under the new regulations, the ALJ properly disregarded the statement in LPCC Buck's letter that Ms. Lobato is incapable of maintaining employment. (Doc. 27 at 22 (citing 20 C.F.R. § 416.920b(c)(3)[34].) However, even assuming the Commissioner is correct on this point, the new regulations do not permit the ALJ to disregard the remainder of the letter as support for LPCC Buck's other opinions. As the agency has explained,

> [w]e frequently receive documents from medical sources that contain different categories of evidence, such as a treatment note that includes a laboratory finding, a medical opinion, and a statement on an issue reserved to the Commissioner. When we receive a document from a medical source that contains multiple categories of evidence, we will consider each kind of evidence according to its applicable rules. *We will not consider an entire document to be a statement on an issue to the Commissioner simply because the document contains a statement on an issue that is reserved to the Commissioner.*

"Revisions to Rules Regarding the Evaluation of Medical Evidence," 82 Fed. Reg. 5844-01, at 5,851 (emphasis added). Thus, even if the ALJ were entitled to limit his supportability analysis to the evidence and explanations LPCC Buck offered for the purpose of supporting her opinions, substantial evidence does not support his finding that these opinions are "entirely without support

---

[34] Pursuant to Section 416.920b(c), statements that a claimant is unable to work are "inherently neither valuable nor persuasive" and the agency "will not provide any analysis about how we considered such evidence in our determination or decision." 20 C.F.R. § 416.920b(c)(1), (c)(3)(i).

or further explanation."[35] (AR 23); *see Stills v. Astrue*, 476 F. App'x 159, 161 (10th Cir. 2012) (agency's reasoning that doctor's assessment "d[id] not contain any medical findings" was "incorrect and unsupported by substantial evidence" where doctor "did supply medical findings for the physical capacities he assigned to [the claimant]") (emphases omitted).

The ALJ compounded this error by disregarding other relevant, objective evidence LPCC Buck generated in his supportability analysis. "[C]ase law addressing medical source opinions expressed on checkbox-style forms underscores that the critical question is whether the checkbox findings, *either on the form itself or elsewhere in the record*, are supported by substantial evidence." *Gorbitz v. Berryhill*, No. CV 17-739 KK, 2018 WL 5281423, at *11 (D.N.M. Oct. 24, 2018) (emphasis added). Here, the record includes LPCC Buck's progress notes from some 28 therapy sessions with Ms. Lobato. (AR 620, 622-43, 649-50, 658, 662, 665.) These notes document not only Ms. Lobato's reports regarding her symptoms, but also LPCC Buck's clinical observations of Ms. Lobato's mental status, which was frequently abnormal. (*See, e.g.*, AR 620 (Ms. Lobato appeared "nervous" as evidenced by, *inter alia*, "restlessness" and "wide eyes"); AR 622 (Ms. Lobato "los[t] her train of thought several times" in session); AR 625 (Ms. Lobato appeared "anxious" as evidenced by, *inter alia*, "stiff posture" and "worried expression"); AR 627 (Ms. Lobato appeared "slightly depressed" as evidenced by, *inter alia*, "flat affect," and "lost her train of thought multiple times" in session); AR 628 (Ms. Lobato appeared "slightly anxious" as evidenced by, *inter alia*, "restlessness" and "worried expression"); AR 629 (Ms. Lobato "continues

---

[35] LPCC Buck's August 2019 letter also causes the Court to question whether the ALJ did, as he claims, consider all of Ms. Lobato's psychological symptoms regardless of the label attached, even though he only identified her depression, anxiety, and seizure disorder as severe impairments. (*See* AR 16, 21.) One of the impairments the ALJ neither listed nor discussed is PTSD, a condition that CNP Miller, LPCC Heumiller, and Dr. McDermott all diagnosed Ms. Lobato as having. (AR 490, 498, 866.) LPCC Buck's letter documented several "symptoms of PTSD" that the ALJ likewise failed to discuss at all, *i.e.*, "flashbacks," "dissociation," "avoidance of places and people that arouse distressing memories," and an "exaggerated startle response." (*Compare* AR 10-26 *with* AR 544.) The Court cannot ascertain whether the ALJ actually considered either the condition or these symptoms of it, because he did not discuss them.

to experience memory lapses in session" and "seems bewildered in such moments"); AR 630 (Ms. Lobato appeared "slightly anxious" as evidenced by¸ *inter alia*, "restlessness" and "fidgeting"); AR 634 (Ms. Lobato appeared "anxious" as evidenced by, *inter alia*, "worried expression" and "obsessive thoughts," and "engage[d] in negative rumination and frequent self-criticism"); AR 636 (Ms. Lobato appeared "slightly distressed" as evidenced by, *inter alia*, "restlessness" and "losing her train of thought repeatedly," and seemed "slightly depressed"); AR 637 (Ms. Lobato appeared "slightly distressed" as evidenced by, *inter alia*, "restlessness" and "losing her train of thought repeatedly," and seemed "discouraged"); AR 638 (Ms. Lobato appeared "slightly distressed" as evidenced by, *inter alia*, "restlessness," "sad expression," and "losing her train of thought repeatedly"); AR 639 (Ms. Lobato appeared "slightly agitated" as evidenced by, *inter alia*, "restlessness," "distraction," and "worried expression"); AR 641 (Ms. Lobato appeared "distressed" as evidenced by, *inter alia*, "stiff posture," "worried expression," and "negative rumination," and "seem[ed] to be having difficulty accessing her resources"); AR 642 (Ms. Lobato appeared "slightly distressed" as evidenced by "stiff posture," "worried expression," and "inability to maintain focus"; she "lost her train of thought repeatedly" and "seemed to be disturbed by her memory lapses"); AR 662 (Ms. Lobato appeared "slightly distressed" as evidenced by, *inter alia*, "stiff posture" and "worried expression"); AR 665 (Ms. Lobato appeared "distressed" as evidenced by, *inter alia*, "low energy," "sad expression," and "ruminative thoughts").) In light of these records, as well as LPCC Buck's August 2019 letter, substantial evidence does not support the ALJ's finding that LPCC Buck's opinions are "entirely without support or further explanation." (AR 23); *see Pickup v. Colvin*, 606 F. App'x 430, 433 (10th Cir. 2015) (ALJ's conclusion was not supported by substantial evidence where it was belied by a letter in the record); *Stills*, 476 F. App'x at 161 (agency's reasoning was not supported by substantial evidence where it was "incorrect").

The ALJ's consistency analysis of LPCC Buck's opinions, 20 C.F.R. § 416.920c(c)(2), is also flawed. In this regard, the ALJ found that LPCC Buck's opinions were "inconsistent with the longitudinal evidence of record, including many instances of far more benign clinical findings than would support such conclusions." (AR 23-24.) The ALJ supported this finding with a string of citations to the record. (AR 23-24 (citing "Ex.2F at 118; 4F at 5, 10, 11, 16; 5F at 5, 12, 17, 22, 27; 12F at 3; 13F at 28, 55, 62, 66; 14F at 2, 6, 11, 13–15, 17, 22, 25; 17F at 41, 45, 50, 54; 23F at 20").) However, many of the records the ALJ cited include clinical findings that are not "benign" and that support LPCC Buck's opinions.[36] (*See* AR 424, 511 (2F at 118; 5F at 27) (CNP Miller noted Ms. Lobato's "anxious" mood); AR 469 (4F at 16) (Dr. Jones observed Ms. Lobato's intention tremor of bilateral hands); AR 496 (5F at 12) (LPCC Heumiller observed Ms. Lobato's depressed, anxious mood, constricted affect, depressive, self-deprecatory preoccupations/ruminations, cognitive impairment, partial insight, and impaired ability to make reasonable decisions); AR 545 (12F at 3) (LPCC Buck observed Ms. Lobato's stiff behavior, halting speech, lost train of thought, tearful, blunted affect, anxious, depressed mood, disorganized thought process, passive suicidal ideation, excessive worry, memory losses, grief, and extreme anxiety); AR 575 (13F at 28) (Dr. Jones noted Ms. Lobato was "nervous/anxious"); AR 620 (14F at 2) (LPCC Buck observed Ms. Lobato's nervousness, restlessness, and wide eyes); AR 629 (14F at 11) (LPCC Buck observed Ms. Lobato's memory lapses in session); AR 723 (17F at 50) Dr. Jones observed Ms. Lobato "perhaps t[ook] a little while with word finding at times" and was "visibly anxious"); AR 881 (23F at 20) (Dr. Cooperman noted Ms. Lobato's unequal pupils,

---

[36] Some of the records to which the ALJ cited in his *consistency* analysis of LPCC Buck's opinions were generated by LPCC Buck herself and thus should have been considered in the ALJ's *supportability* analysis of those opinions. 20 C.F.R. § 416.920c(c)(1), (c)(2). However, the Court will address the instances in which the ALJ mischaracterized LPCC Buck's findings as inconsistent and "benign" in the context of his consistency analysis, because that is where the mischaracterizations appear.

abnormal finger-nose-finger test and heel-to-shin test results, and blunt affect).) In short, much of the evidence the ALJ characterizes as inconsistent and "benign" was not, and thus, his consistency analysis is "incorrect" and fails to provide an independent, adequate reason for his rejection of LPCC Buck's opinions.[37] *Pickup*, 606 F. App'x at 433; *Stills*, 476 F. App'x at 161.

> 2. *The ALJ did not adequately support his rejection of CNP Miller's opinions.*

The ALJ explained his rejection of CNP Miller's opinions in terms very similar to those he used to reject LPCC Buck's opinions. His discussion of CNP Miller's opinions is as follows:

> In questionnaires, Michael Miller, PMHNP-BC, opined that the claimant has marked limitations in understanding, remembering, or applying information, maintaining concentration, persistence, or pace, and adapting or managing oneself, as well as that she requires ongoing medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) to diminish the symptoms and signs of her mental disorder and that she demonstrates marginal adjustment. In a later form, he opined that she has extreme limitations in understanding, remembering, or applying information and maintaining concentration, persistence, or pace, with marked limitations in interacting with others and adapting or managing oneself. In a further breakdown, he indicated that the claimant has moderate or marked limitations in every subcategory of these areas. These opinions are unpersuasive. Here, too, they are checkbox forms entirely without support or further explanation. Moreover, they are inconsistent with the longitudinal evidence of record, including many instances of far more benign clinical findings than would support such conclusions.

(AR 24 (citations omitted).)

For his supportability analysis, 20 C.F.R. § 416.920c(c)(1), the ALJ asserted that CNP

---

[37] The ALJ used the same string of citations to support the proposition that Ms. Lobato "presented with benign mental findings" on "many occasions" earlier in his decision. (AR 23.) In that paragraph, he also used a string of citations to support the proposition that Ms. Lobato "often denied mental symptoms altogether or reported the symptoms well controlled," but again, some of the records do not support the proposition for which they are cited. (AR 23; *see, e.g.*, AR 463 (4F at 10) (Ms. Lobato reported activity change, fatigue, and sleep disturbance); AR 469 (4F at 16) (Ms. Lobato reported tremors, speech difficulty, and sleep disturbance); AR 594 (13F at 47) (Ms. Lobato reported memory impairment of 3 to 4 months); *see also* AR 422 (2F at 116), 487 (5F at 3), 500 (5F at 16), 509 (5F at 25) (although Ms. Lobato reported "well controlled" symptoms she also reported "functioning as somewhat difficult") *and* AR 504 (5F at 20) (although Ms. Lobato reported "well controlled" symptoms she also reported "functioning as somewhat difficult" and "traumatic memories").

Miller's opinions are "unpersuasive" because "they are checkbox forms entirely without support or further explanation." (AR 24.) This analysis is the same as the ALJ's supportability analysis of LPCC Buck's opinions and suffers from the same defects. First, as discussed in Section III.A.1, *supra*, the ALJ cannot reject a medical source opinion "solely on the basis that it is rendered on a checkbox-style form." *Hidalgo*, 2020 WL 2316190 at *6. Thus, the fact that CNP Miller expressed his opinions on checkbox forms is not, by itself, an adequate reason to reject them.

Second, the Commissioner is again legally and factually mistaken in maintaining that CNP Miller's opinions are, as the ALJ asserted, "entirely without support or further explanation." (AR 24.) Legally, and notwithstanding the Commissioner's suggestion to the contrary, the ALJ was not permitted to disregard CNP Miller's evidence and explanations presented for reasons other than to support his opinions, such as to document clinical findings or justify treatment. 20 C.F.R. § 416.920c(c)(1). Rather, the ALJ was required to consider how "*relevant* the objective medical evidence and supporting explanations presented by [CNP Miller] *are to support* his . . . medical opinion(s)," regardless of why they were generated. *Id.* (emphasis added).

Factually, in turn, the Commissioner is mistaken in asserting that CNP Miller did not present any objective evidence or explanations for the purpose of supporting his opinions. On the contrary, in his notes regarding Ms. Lobato's January 4, 2018 appointment, he wrote that Ms. Lobato

> tried to work part time - could not tolerate the stress. Wanting to apply for disability. Susan's residual function is markedly limited in the are[a]s of understanding and memory, sustained concentration and persistence, social interaction, and adaptation. [I] will support her getting disability.

(AR 425.) And on the form he completed on November 27, 2018, he included a hand-written notation of Ms. Lobato's "memory deficits secondary to anxiety [and] inability to make decision[s] when under minor/moderate stress." (AR 532.) The January 2018 treatment note and the

handwritten notation on the November 2018 form directly explain and support CNP Miller's opinions.

According to the Commissioner, the ALJ properly found that CNP Miller offered no supportive evidence or explanation for his opinions because the notation on the November 2018 form "was not [CNP] Miller's explanation:   rather it was 'additional significant mental limitations[.]'" (Doc. 27 at 23 (emphasis omitted).) The Commissioner is correct that the notation was made on blank lines following the prompt, "Please describe any additional significant mental limitations[.]" (AR 532.) However, the Commissioner has cited to, and the Court is aware of, no legal authority that would permit the ALJ to elevate form over substance by ignoring the notation's explanatory value because of where on the questionnaire CNP Miller wrote it. Thus, even if the ALJ were entitled to limit his supportability analysis to CNP Miller's evidence and explanations offered for the particular purpose of supporting his opinions, substantial evidence does not support the ALJ's finding that these opinions were "entirely without support or further explanation." (AR 24); *Stills*, 476 F. App'x at 161.

Moreover, the ALJ again compounded this error by ignoring other relevant, objective evidence CNP Miller generated in his supportability analysis. *See Gorbitz*, 2018 WL 5281423 at *11 ("[T]he critical question is whether the checkbox findings, either on the form itself or elsewhere in the record, are supported by substantial evidence."). The record includes CNP Miller's notes from some 25 appointments with Ms. Lobato. (AR 324-39, 349-60, 365-426, 487-91, 500-08.) These notes document not only Ms. Lobato's reports regarding her symptoms, but also CNP Miller's clinical observations of Ms. Lobato's mental status, which was frequently abnormal. (*See, e.g.*, AR 326, 330, 352, 355, 365 (assigning GAF score of 48); AR 334 (noting "depressed" mood); AR 350 (noting "anxious and irritable" mood); AR 353, 356, 424 (noting

"anxious" mood); AR 366 (noting "anxious and depressed" mood, poor reasoning, impulse control, judgment, and insight, and "abasing" self-perception); AR 379 ("still struggling with depression . . . anxiety under control as long as anxiety producing situations are avoided"); AR 384 ("still a little depressed"); AR 387 (noting "depressed" mood); AR 388 ("struggling with several issues").) In light of these records, as well as CNP Miller's January 2018 treatment notes and November 2018 handwritten notation, the ALJ's finding that CNP Miller's opinions are "entirely without support or further explanation" is simply wrong. (AR 24); *Pickup*, 606 F. App'x at 433; *Stills*, 476 F. App'x at 161.

Further, the ALJ's consistency analysis of CNP Miller's opinions, 20 C.F.R. § 416.920c(c)(2), is identical to his consistency analysis of LPCC Buck's opinions and is flawed for the reasons discussed in Section III.A.1, *supra*.[38] As explained in that section, much of the evidence the ALJ characterizes as inconsistent and "benign" was not, and thus, his consistency analysis is not supported by substantial evidence and fails to provide an independent, adequate reason for his rejection of CNP Miller's opinions. *Pickup*, 606 F. App'x at 433; *Stills*, 476 F. App'x at 161.

**B.  The ALJ's errors were not harmless.**

The Tenth Circuit "appl[ies] harmless error analysis cautiously in the administrative review setting." *Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005). Nevertheless,

> harmless error analysis . . . may be appropriate to supply a missing dispositive finding where, based on material the ALJ did at least consider (just not properly), we could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way.

---

[38] Again, some of the records to which the ALJ cited in his *consistency* analysis of CNP Miller's opinions were generated by CNP Miller himself and thus should have been considered in the ALJ's *supportability* analysis of those opinions. 20 C.F.R. § 416.920c(c)(1), (c)(2). However, the Court will address the instances in which the ALJ mischaracterized CNP Miller's findings as inconsistent and "benign" in the context of his consistency analysis, because that is where the mischaracterizations appear.

*Id.* at 733-34 (quotation marks and ellipses omitted). The failure to provide adequate reasons for rejecting a medical opinion "involves harmless error if there is no inconsistency between the opinion and the ALJ's assessment of residual functional capacity." *Mays v. Colvin*, 739 F.3d 569, 578-79 (10th Cir. 2014). In that situation, the claimant is not prejudiced because the outcome would have been the same even if the medical opinion had not been rejected. *See id.* at 579.

Here, however, LPCC Buck's and CNP Miller's assessments of Ms. Lobato's work-related abilities on the one hand, and the ALJ's RFC determination on the other, are inconsistent: the RFC determination fails to account for many of the functional limitations these providers assessed. (*Compare* AR 20 *with* AR 531-36, 538-42.) Although the RFC the ALJ assigned does include non-exertional limitations that could account for some of the moderate limitations to which LPCC Buck and CNP Miller opined, *Smith*, 821 F.3d at 1269, at a minimum it does not account for the "marked" and "extreme" limitations they assessed.[39] Had the ALJ credited these medical sources' opinions, he would have assigned Ms. Lobato a more restrictive RFC, and this would likely have resulted in different findings at steps four and five. Moreover, ample record evidence supports the medical source opinions at issue, such that the Court cannot "confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way." *Fischer-Ross*, 431 F.3d at 733-34. Thus, the ALJ's failure to adequately explain his rejection of LPCC Buck's and CNP Miller's opinions was not harmless.

---

[39] The "Medical Assessment of Ability to Do Work-Related Activities (Mental)" forms CNP Miller completed define a "marked" limitation as a "severe limitation which **precludes** the individual's ability usefully to perform the designated activity on a regular and sustained basis, i.e., 8 hours a day, 5 days a week, or an equivalent schedule. The individual cannot be expected to function independently, appropriately, and effectively on a regular and sustained basis." (AR 531-32, 541-42 (emphasis in original).) The other forms LPCC Buck and CNP Miller completed define a "marked" limitation to mean that "[f]unctioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited," and an "extreme" limitation to mean that the claimant is "[n]ot able to function in this area independently, appropriately, effectively, and on a sustained basis." (AR 533-35, 538-40.)

## IV.  <u>Conclusion</u>

For the reasons stated above, the Court recommends that Plaintiff's Motion to Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 23) be GRANTED, and that the Commissioner's decision denying Ms. Lobato's claim for SSI be REVERSED and this matter REMANDED to the Commissioner for further proceedings in accordance with this PFRD.

**Timely objections may be made pursuant to 28 U.S.C. § 636(b)(1)(C).  Within fourteen (14) days after a party is served with a copy of these proposed findings and recommended disposition that party may, pursuant to Section 636(b)(1)(C), file written objections to such proposed findings and recommended disposition with the Clerk of the United States District Court for the District of New Mexico.  A party must file any objections within the fourteen-day period allowed if that party wants appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**

KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE